Good afternoon, your honor. I have a big block on my screen for somebody out there. We have one case for argument on Zoom this afternoon. That is Tesla Incorporated, International Union, etc. versus National Registration Board. We'll hear from Mr. Salmons, Mr. Curry, and Mr. Jones in that order. Thank you and good afternoon, your honors. And may it please the court, I'm David Salmons on behalf of Tesla. The National Labor Relations Act and the First Amendment protect an employer's robust speech about the downsides to unionization. Elon Musk's tweets about stock options fits squarely within that protection and were not a threat of reprisal in violation of the act. The legal test which this court applies de novo is whether employees would reasonably view the speech in its full context as a threat of unilateral reprisal by the company. And here no reasonable employee could read the tweets that way. First, and importantly, they were not even questions by some of Mr. Musk's more than 22 million Twitter followers. The tweets are not threatening on their face. Musk disavowed any threat as soon as a follower asked about it. And he explained the basis for his prediction that the union, not the company, would reject stock options. Sorry, what's up? Oh, I'm sorry. I thought there was a question. My apologies. He explained the basis for his prediction about the fact that the union, not the company, would reject stock options based on the union's dislike of such compensation, which the board and the union have never tried to show was untrue. Mr. Salmons, to what extent was this issue of the compensation to stock options and perhaps other ways are nontraditional for auto workers an issue in the unionization campaign? Was that part of the argument by Tesla as to why it makes no sense? And Musk was repeating that? Well, your honor, I don't think that, for example, the boards, the other parts of the board's decision dealing with other activities during the some of the unionizing efforts address this issue of stock options. But it was well known at Tesla that and Mr. Musk is well known for speaking out about their strong preference for stock options as a form of compensation to align interests of employees and managers and owners at the company. And so that is an important part of the backdrop against which these comments were made for sure. Where were you looking at H.C. or whatever the statute is that permits companies speak out against unionization so long as they're not threatening? I was just wondering, to what extent was this issue of stock options part of that speaking out fits within that speaking out as to why unionization doesn't make sense more than just in this one tweet? Well, I do think if you look in the record, for example, there's there's Tesla to its workers, explaining the importance and priority for the company of stock options as a form of compensation. And again, this is an issue on which Mr. Musk had spoken out repeatedly about. I don't think there's any dispute about that. But in the context here of the tweets themselves, you know, the key question is whether there's a basis to say this was a threat of you know, I think that when you look, for example, at the at the initial tweet, which is the focus of the board's attention, it does it does two things. First, it declares that workers are free to unionize any time, which implies without interference from the company, it is the opposite of a threat. And second, it then contrasts what the union would offer workers with what the company is already offering them to question why Tesla workers would even want to pay union dues in the first place. And everything about the sentence, the board claims is a threat. And here's that sentence. But why pay union dues and give up stock options for nothing? Everything about that sentence is naturally read as a statement about what the union, not the company, will or will not do. Who will counsel you're an able lawyer and you and you're forwarding an interpretation on that. But I don't think the board was is completely out of line and interpreting it. Otherwise, I would say there's a lack of clarity of what he means by that statement. And certainly maybe he did mean and I accept that he did and follow up tweets help. But I think it's possible to read that, that the cost, the price you will have to pay if you unionize is you'll give up your stock options. And it doesn't explain why that's the cost you'll have to pay. Is it what is the standard? Is it what a reasonable observer would interpret this to mean? Well, that is that is that is the sort of objective element of the standard for sure, is whether an employee would reasonably construe it as a threat of unilateral company reprisal. And your honor, what I'd like to do, if possible, is push back a little bit on the permissibility of that reading of that initial tweet and then make a couple of points about why when you put it in the context of the entire Twitter thread, there's no possibility that an employee could read the tweet that way. And the point I would make about the sentence that is the focus here is that each element of that statement is about what the union will or will not do, who will make the Tesla team pay union dues, the union who will deliver nothing in return, the union and who will make them give up stock options. Again, that's naturally read as being a reference to the union. But if the court thinks there's any doubt about that, as we pointed out in our briefs, the law requires that those statements be put in their full context. And that would include the entire Twitter thread here, which makes abundantly clear. As soon as the issue was raised, Mr. Musk disclaimed any unilateral company action that could constitute a threat. And it was two days later. I mean, the one tweet is out there on its own. It went out instantly, right? Well, that is that is correct, your honor. But the the statement that the the issue of it being a possible threat came about a day and a half, two days later, and Mr. Musk immediately responded that he was not speaking about what the company would do, but what the union would do. They also put out a statement to the press saying that he wasn't doing that, correct? Well, that that's correct as well. Wasn't that an indicator that maybe that first tweet could have been read the way that the board found that it found found that it was to be read? I don't think so, your honor. I think I think that I think that a desire to reasonable inference that if they put out a statement and they sort of clarified in the later Twitter, I mean, Twitter thread, that maybe maybe there was something that needed to be cleared up. I mean, that is it is it was it improper for the board to have read it that way? I do think it was improper to read the initial tweet as a threat. I think you could look at that initial tweet. We would disagree, but I think you could look at that initial tweet, keeping in mind that we're talking about 140 characters at the time. And so long elaboration is not really possible in that format. But you could look at it and think perhaps it's ambiguous. I think that's the most you could say. But even that alone, I think, would not be sufficient to deem it an unprotected threat under the First Amendment and under the act. But once you once you add to it the full context, which includes the clarifications, which I what is what is the full context? Is it just the Twitter thread or is it this backdrop of a number of violations that are not even the subject on appeal? They're not contested. In other words, how do you define context? Well, I think I think to start with, the context must include the fact that this is not speech directed at employees, but speech, public speech that is in response to questions from random Twitter users that aren't employees of the company about his position on unions generally. And so I think that that makes this very different than any other case in which a court has upheld a finding of a threat based on supposed lost benefits. I think that is a very significant part of the context here. I think in the United States, we recognize the inherent conversational nature, the back and forth nature of Twitter. And, you know, the Second Circuit in its night First Amendment Institute case talks about this aspect of the Twitter dialogue. And I think it's I don't think there's I think it would be clear error and do an injustice to the concept of the First Amendment context requirement to on Twitter, just because sometimes a question in response to an initial post may come a day or two later. In that sense, it may be a bit of a slow evolving conversation, but it's still a conversation. And there's no evidence that anyone that looked at this wouldn't have access if they wanted to, they could click on the link, they would see the entire thread, the ALJ itself found that this was all part of the same thread. And the in terms of the public's response to it, there were, if you combine the two tweets that followed up that initial tweet, there were more retweets and likes and reposting of those than even the initial one. So we think it is clear that this court's cases, you know, especially federal mogul, Florida, Florida Steel, Brown and Root require that these things be looked at in their full context and have warned very carefully against looking at First Amendment statements pulled out in a vacuum or in isolation. And we think that that's exactly what the board did here. But counsel, isn't isn't this all really back down to the standard of review? In other words, all these arguments are well and fine, but don't they really go to the board? I mean, we simply look for substantial evidence. And if they read it differently than you did, but there's substantial evidence for that, how do you prevail? Well, first, your honor, that the law we think is clear, especially in this circuit, that that's it's not a deferential standard of review. It's a de novo standard of review here for for multiple reasons. First, the Supreme Court's decision in EPIC systems make clear that where the board is not just interpreting the NLRA, but its application and intersection with other law, other statutes, or in this instance, the First Amendment, that there is no deference and de novo review is required. The Supreme Court in this court's First Amendment cases, Bose, Hurley, this court's decision in Porter, make clear that in the First Amendment context, there is a constitutional responsibility for independent judicial examination of the complete record. This court, in an opinion by Judge Southwick in employer solution staffing, stated that we apply the de novo standard to agency determinations of constitutional law. The court also applies de novo review to a board's interpretation of written speech. And so that's again, Brown and Root, Federal Mogul, big three industries all make this clear from this court's precedence. So we don't think there's any possibility for this court to do anything other than apply de novo review. And in doing that here, we think it's clear that there's no possibility, especially given putting the tweet in its proper context, that no employee could feel threatened by the speech. It's not a statement of unilateral action on the part of the company. It's a statement about what the union would do based on its traditional hostility to compensation, a prediction that the board and the union has never undertaken to show is untrue in any meaningful sense. And so for all those reasons, the tweets themselves cannot be an unlawful labor practice. Also, you're out of time. I ask the indulgence of our presider and extra time can be added to your side. I want to ask you about the discharge of Ortiz. I don't want you to give me the 10 minute exploration of that. What what's the key takeaway that you want us to have on why this isn't just a fact question resolved by the board and it's not what you can convince us to do about it? Your Honor, the primary reason because of the legal error in the board's decision, the board embraces a broad right on the part of employees to lie to questions if they are if the questions in any way connect with concerted activity on the part of employees. And you're arguing that that is a novel position of all that is the position they seem to be taking. This be a first circuit case that gave any comfort to that point of view? No, Your Honor. In fact, we think it's directly in conflict with this court's decision. Federal mogul that makes clear that any employer has the right to demand that its employees be honest and truthful in every facet of their employment and that the lie is itself a justification. What the board does as well as it says there was no legitimate business purpose on the part of precedent makes clear that's wrong as a matter of law for two primary reasons. And I'll just state these and your honor and be very quick about it. The first is the board's decision in Midmountain Foods, which we cite in our reply brief, which holds that employees have no statutory right to use an employer's equipment or media as part of their organizing activities. So since the use of unionizing activity, asking questions about the use and how those internal procedures and resources were used is a legitimate business interest. The second is the board's own decision in the Fresenius case, which we cite in our reply brief as well, which makes clear that employers have a legitimate business interest to investigate, ask questions about facially valid complaints of workplace misconduct, including allegations of harassment or wrongdoing against other employees. And so because of that, we think it's clear that Tesla here had a right to inquire as to what happened with its internal resources in this context. And there was no right to lie under this court's precedence. All right, counsel. Thank you. Thank you. Good afternoon, your honors. I'll proceed if it pleases the court. My name is Daniel Curry, and I'm speaking today on behalf of Petitioner and Intervener United Auto Workers and for the at Tesla's Fremont, California manufacturing plant. Tesla has repeatedly coerced, threatened, and discriminated against its employees in response to their NLRA protected efforts to secure union representation and better working conditions. I will speak briefly about the union's petition for review. Then I will speak in support of the board's decision on the unlawful termination and the CEO's coercive tweet. I will note at the onset that the board's 2020 decision was unanimous on both of the violations Tesla has appealed. A notice reading is appropriate in this case due to severe and pervasive unfair labor practices that Tesla has committed, many of which the company does not contest in this appeal. The violations not contested by Tesla include requiring employees to sign a confidentiality agreement prohibiting them from speaking to the media about working conditions, repeatedly harassing and preventing employees from distributing pro-union leaflets, interrogating employees about their requests for worker safety information, and disciplining employee Jose Moran for engaging in protected union activity by accessing electronic employee directory. Again, these are uncontested. These are serious violations that occurred during a union that severely harmed employees' ability to freely decide whether to support a union. A notice reading is therefore the appropriate remedy. Turning to the termination, substantial evidence supports the board's finding that Tesla unlawfully fired pro-union employee Richard Ortiz because of his protected union activity. This decision follows years of precedent at the NLRB and at this court. The NLRA gives employees the right to keep confidential their union activities. Justice Kavanaugh called this principle well settled in the 2012 DC Circuit Opinion Veritas Health. The ability to keep union support and activities private ensures employees can fully and freely exercise their right to either support or not support the union. That is why under a long line of cases under Section 881, termination for dishonest answers in response to questions about union activity is not lawful unless there is a bona fide investigation into actual misconduct. In this case, Tesla questioned Ortiz to find out who assisted him with his pro-union Facebook post. Ortiz then refused to name the other union supporter who assisted him, Jose Moran, fearing both would be fired for their union activity. Tesla then fired Ortiz for protecting his fellow union supporter. Numerous cases have found similar employee terminations unlawful, and those include the NLRB decisions Trade Waste and Paragon, the Fifth Circuit case Corda Restaurants, and the DC Circuit case United Services Auto Association, and those are all recent cases involving similar employer terminations claiming someone was dishonest when in fact they were responding to unlawful questions about union activity. So what rule of law would you have us take from those that would apply to this situation? You heard what your friend on the other side was arguing. Is there an exemption for lying, and if so, in what context? It's a very narrow exemption, and it's when there's unlawful questions being asked, okay? And what is an unlawful question? It is directly into a person's protected union activity when there's no bona fide investigation, so it's very narrow, and the cases bear out this point that when there is a bona fide investigation into something that actually happened, a policy being broken or wrongdoing. Even if it's connected to union activity. If there's a bona fide, as in Fresenius, if there is a bona fide investigation, then those questions can be asked, okay? In Fresenius, it involved union activity, but it also involved derogatory sexist words, and multiple women complained about the use of those words, and so that was found, the lying was not okay because it was an actual investigation. Here, the company has no grounds for this investigation that they undertook. First, the company no longer contends that improper electronic access justified the investigation. They claimed at the time that there was a policy against accessing this workday program to look at the electronic directory for non-work reasons. In fact, they disciplined Jose Moran for doing that. They do not contest the board's finding that that was an unlawful discipline of Jose Moran. Second, Tesla's argument that this was an investigation into harassment is not supported by the record. Tesla has never invoked a company anti-harassment policy. It is not even part of the record. There's no bona fide complaint was made. The notice of this Facebook posting went directly to an upper management person, and it came from somebody who had just spoken publicly against the union at the state legislature, and when the message was sent to the upper level management person, it was, it looks like we're getting under people's skin, smiley face emoji, so this was not a bona fide complaint, but Tesla used that to launch into investigation of the two most prominent union supporters at the plant and ultimately found a way to fire Richard Ortiz for his union activity. Turning to the Tesla CEO Elon Musk's tweet, the tweet was a threat of retaliation, not a lawful expression of opinion. What makes it a threat? The statement predicts economic consequences of unionization that are fully in Tesla's control. This is the long settled standard under Gissel Packing, and when interpreting the tweet, Gissel Packing requires we view the statements in light of the economic dependence of the employees on their employers. It also has to be viewed in the context, and it's very clear that the subsequent tweets explain very clearly what the intent was. How's that not enough? The subsequent tweets actually added to the confusion. They did not clarify anything, your honor. They misstate who has the power to take away an employee's stock options. The idea that they're putting out there that a union could take away an employee's stock options just doesn't fit with reality. The employees receive their wages and benefits from the employer, and it's the employer that can unilaterally take them away, and so simply saying his reply is only no UAW does that. That's not a clarification, your honor. That has no basis in fact or reality, and in fact, the UAW has no policy against stock options, and there are collectively bargained agreements of the UAW that involve stock options, so it was just untrue on multiple levels. Also, let me ask you about that last statement. I believe it's in Mr. Salmon's brief, but regardless of the arguments made, there's no evidence that in this case that the UAW or other related unions negotiate for stock options and automobile worker contracts. Is that a fair statement that there's nothing in the record to support what you just said? There is a small bit in the record. Let me first say that it's not relevant to this decision because- I thought that was your position, so I'm sort of wondering why you added it, but go ahead. Well, in the record, it is in the record that UAW does not have a policy against stock options, so I only bring it up because they keep hammering it, but it is not relevant to this decision in that it was Mr. Musk decided to make a statement, and to your point earlier, this was not Elon Musk's response to something that the union had put out or one of the conversations they campaigned. It was him raising this, okay, and I will add that the context really matters here. Tesla employees have a strong interest in what their CEO says on Twitter. It directly affects their livelihoods and their paychecks. Employees are more attuned to the implications and power of their boss's words, and Musk has, on many occasions, made official company announcements on his Twitter, including statements about new vehicles, production goals, and working conditions at the Fremont plant. There's been some suggestion by Tesla here that there's no information about how many employees even saw this. Probably wasn't a fact question that was raised. Is there anything in the record about how many Tesla employees are on or whatever it would be are on his Twitter account? Not in the record, your honor. We have in the record that he has 22 million followers, that the message was widely republished in news reports, and that employees who did take the stand, one, the only one that spoke to it had seen the message. All right, counsel. And I will add that because of Tesla employees' economic dependence on their employer and Mr. Musk in particular, there really shouldn't be any doubt that this message was widely dispersed among Tesla employees in sort of the water cooler way of a company. This is obviously was a hot topic at the time. And unless you have further questions for me, I will reserve the rest of my time. Thank you, sir. Mr. Jost. May it please the court. My name is Micah Jost for the Labor Board. I understand most of the as well. But if I may, I'd like to begin with one point about the Ortiz discharge to ensure it's not overlooked. In its reply brief at page 25, the company. Yes, your honor. In its reply brief, the company accuses the board of a self-contradiction in its findings about why Ortiz was discharged. I just want to point out that there is no contradiction. What the company is referring to is the ALJ reserve, excuse me, resolving conflicting testimony about the reason Ortiz was given on the day of his discharge. If you look at footnote 103 and the language that the company cites at page 6285 of the record in the board's decision, that's where the ALJ is addressing a conflict between testimony that he was told he was fired for violating a confidentiality agreement versus testimony that he was fired for lying. The board ultimately found that if he was, in fact, fired for lying or if the company proffered that as its reason, that was an admission of unlawful motive. And in any event, under right line, its real reason was not the lie, but rather an intent to punish an employee who had pushed back against its hand-chosen emissaries to Sacramento. The two rationales. Do you accept Mr. Curry's explanation of how we should interpret the law in this area about the limited right to evade candidly answering questions? Your Honor, I think he describes the test essentially correctly. In our brief, I think our statement is drawn from the case law that if an employee has a reasonable basis for believing the employer is prying into union activity and there is no legitimate basis for the questioning, then an evasive or untruthful response inextricably intertwined with the protected activity is itself protected. That's what you'll find in cases like Roney Plaza and Cordua from this court that have reaffirmed that standard. But in any event, under right line, there would still be a violation here. The court can affirm on either basis. Turning to the tweet, and I'm happy to come back to Ortiz, of course, but there's been a suggestion that there's something novel about a statement that was not necessarily directed at a specific employee or at employees. In that respect, I'd point the court to its decision in the Laredo Coca-Cola bottling case where there was a threat that appeared in the form of a quote of a manager in a newspaper. That quote, if you look at the underlying decision in order of the board, that quote came about from a cold call that a reporter made. There's no evidence that the employer was trying to speak to employees. And in fact, it claimed the same day to the union that it was misquoted. The board then applied the passive and or texted standard to determine whether that was an effective repudiation. It was not. Similarly, in the Pennsylvania glass sand case, which was enforced in the DC circuit, there was a press release that was aimed at one unit of employees on strike. The board found that it coerced another unit that was not on strike and that the employer's subjective motivation to direct its message at one unit versus another was completely irrelevant. That, of course, accords with the long settled standard which this court has endorsed, which is that it is an objective test. Testimony about whether an employee felt threatened, testimony about whether an employee continued to engage in protected activity. This court said in Hendricks, quote, misses the whole point. In Sturgis, Newport, similarly, that evidence is the point. So that evidence is typically excluded in board proceedings because it is entirely irrelevant as it was here. Counsel, what's our standard of review? Do you agree with counsel? This is DeNovo, and we're looking at the agency's application of constitutional law. Your Honor, standard of review was the next point I had on my list. And in that regard, I disagree with opposing counsel. As we laid out in our brief, what the court needs to be guided by here is the Supreme Court's decision in Gissel. There at page 619 of the Supreme Court's decision, it states the standard as the board, quote, could reasonably conclude that the statements in context, in their labor context were coercive. That included both written and spoken statements. And it stated that the courts must recognize the board's competence in the first instance. I don't think there's any ambiguity there. And this court has not apparently recognized any ambiguity there either. In cases like Riley Beard and Mangurians, in Mangurians, the court said that the question of whether there was a threat in context was a question of, quote, the possible impact upon employees, which is a question of fact. That is directly quoting a case called Southwire from 1970. Those cases predate any authority that the company is trying to raise for some sort of DeNovo standard review. In cases like Bose, which it relies on heavily, are cases that arise dealing with an appellate court's review of a district court. Those cases do not address the labor context. They do not address a review of an agency carrying out its statutory role to find facts. And under Agostini and the cases that this court has decided applying that principle, as long as the Supreme Court itself does not change the standard in Gissell, which this court has repeatedly applied, as long as that's the case, that is the standard that this court needs to continue to apply. I also want to note that in Federal Mogul itself, if you read just a little bit farther from the erroneous language that the company cites about DeNovo review, even though the panel in that case, the court of claims judge writing for the panel in that case described it as DeNovo review of a written instrument, he ultimately stated that the question in the full context of the labor relations setting was a question of substantial evidence, and the panel did not find substantial evidence. So I think if you look closely at Federal Mogul, it in fact confirms the standard of review that's appropriate here. As far as the context and what exactly it is, the answer there is unmistakable based on the UNF West case. In that case, the employer was presenting its anti-union pitch to its employees. It began with extemporaneous statements, which conveyed a threat. And later in the presentation, it presented slides, which it claimed had clarified that threat. This court in reviewing the board's decision cited the standard that the board has applied in PASAVANT and TEXID, which is a six-factor repudiation standard. Under that standard, it is not enough to simply say, whoops, we didn't mean what we said. It's not enough to contradict it. What you have to do is have a timely response that is unambiguous, specific, adequately published, provides assurances against further violations, and is in a context free of violations. That's not just UNF West. That's the Taylor Chair case, which this court enforced, where the employer tried to disavow a supervisor's threat but didn't provide assurances. That's, again, Laredo Coca-Cola, where if you look at the board's underlying decision, the company told the union the very same day that it had been misquoted, but it did not provide assurances. That was insufficient. TEXID, the attempted clarification came within five days, and Cooper Tire, which is an unpublished Sixth Circuit decision, similarly there, the employer tried to clarify within days, and that was not part of the context. What this court has said is the context is what was in existence when the employees heard the threat or the statement that they would reasonably understand as a threat. Which brings me to the next point, which is, as the court inquired, and as I believe Mr. Selman's correctly stated, the question is whether employees could reasonably conclude that the statement at issue was a threat. That's a quote from the court's Hendricks decision. That question, what they could reasonably conclude, is evaluated with an eye to the dependence that they have on their employer, and it's also evaluated with the recognition that employees know that the employer has conferred benefits away. The company has suggested that there's somehow some difference when we're talking about stock options, that that's somehow different from plant closures or threats to take away other benefits. There is no such distinction in the law, and in fact the cases that we cite are clearly to the contrary. I can tell you four cases, three of which were enforced by a court. The fourth one did not go before a court, I believe. Bearing, which is enforced in the Third Circuit. Dincorp, enforced in the Sixth. Belcher Towing in the Eleventh. And Donaldson Brothers. Those four cases, which we cite in our brief, all dealt with threats to take away either stock options or employee stock ownership plans. Those are not the exact same thing that the company conflates them in its brief and in the Law Review article it cites, but nonetheless those both are circumstances where the employer is hoping to make its employees feel like they have some ownership of the company and incentivize them to work harder for that purpose. And when an employer threatens to take those things away, reasonable employees understand that they are being threatened. In each of those cases, it was simply a statement about what employees would lose or could lose or probably would give up if they embraced unionization, and that is precisely what we have here. What would have had to be said, in your view, to be a sufficient clarification? What was missing and what was the follow-up? Well, Your Honor, again, if he had, if he had issued this tweet and then attempted subsequently to clarify it, I think he would run into the repudiation standard. Perhaps if he had issued the tweet as part of a continuous thread rather than what he did, which is issue a tweet, wait for, if you go to the link, there's something like 60 or more intervening comments, many of which note that he's obviously threatening employees, and he eventually responds two days later. If he had instead issued his statement as a single, essentially something analogous to a letter, which is what this court considered in the Selkirk case, then he may have been able to provide further context. Let me ask you then, are you saying as prevalent as Twitter is these days, maybe one of these days I'll figure out how to use it, but as prevalent it is in so many people, there is no way to clarify in the unfair labor practice arena, just because of the nature of that means of communication? Well, Your Honor, what we have here, and I don't have a Twitter account. I can't speak with expertise personally, but the, I mean, all I'm trying to get here is certainly the his position is that there was an effort by Musk to clarify this fairly promptly, regardless of what the adjective should have been. What I'm hearing from you is he, basically, there was no way to do it so long as he was using Twitter. So excuse me, that's two questions. One, I'm not, two issues before us. One is, is what he did clarifying in nature, but is there something about the way it was done because of the way Twitter works that in your view is just not sufficient, even if we found the language did clarify? Well, Your Honor, the board here didn't speak to, didn't sort of lay out an outline for how an employer can make it. Well, if he fell short in this case, it'd be good for this court to understand what's missing. Well, and the basic standard is in Gissel, and I think under Gissel, if you open with a threat, if you open with a threat with no prior context, if you open with a statement that in the terms of the court leaves employees thinking that the employer may or may not take action solely on its own initiative for reasons unrelated to economic necessities, which is precisely what we have here. If that's what you open with, then perhaps in the same message, you could make clear that that's not in fact what you're saying. But it's, I don't know if the board would view a chain of tweets that's contemporaneous and connected or, you know, people can attach statements or, you know, a PDF or an image to a tweet. I can't advise Mr. Musk on how he should have gone about this except that he should not have opened with a statement that employees reasonably could take as a threat and then come back with statements that were completely ambiguous, did not take away the threat, and did not meet the repudiation standard that this court applies. As far as... Can this non-threat be used again in the future? Excuse me, Your Honor? Can the company use this type of non-threat in the future without any repercussions? In other words, the board says this is all okay for any company in the future? I'm not sure I understand your question, Your Honor. I mean, the board didn't approve any language here. The board found a violation based on this language, which employees in the context of the full circumstance of union opposition and the numerous violations that the company had committed when the company simply said with no clarification that employees would lose a benefit if they unionized under cases like Hendrix, where the employer said profit sharing would be, quote, out, or InterMedix or BamaCorp, any of those cases where an employer simply says without explanation or clarification that a choice for unionization will result in lost benefits, that is the kind of statement that's unlawful, and that is what the board reasonably found Mr. Musk to have done here. The company, again, simply tries to get around that by conflating all the statements together. That's not an answer for the reasons that we've set forth. And I'd like to briefly note, as far as the remedy, there's an argument from the Chamber of Commerce, which is not properly before the court, regarding the First Amendment rights of other Twitter users under the In-N-Out Burger decision. Section 10e would bar the court from considering that argument about the implications of a remedy that were not raised before the board. Similarly, the Mid-Mountain Foods argument that the company raises in its reply brief, as far as I could tell, that argument was never presented to the board, the claim that standards having to do with access to company equipment, that's simply not properly before the court. But when it comes to evaluating the investigation, what the reasons were, what the company's true motivations were, I want to ask the court to simply focus on Gesowich's actual final report, which is at page 4760 of the record, and his interview notes from Ortiz, which is at 4518. In both of those documents, it is clear that from the start, his only serious concern was the use of Workday. As Mr. Curry noted, the company has not objected to or challenged the board's finding that there was no restriction on Workday, and in fact, that the company created it unlawfully in response to the union activity of these individuals. So from the start, the investigation was into a matter that the company had no legitimate interest in investigating that is essentially undisputed based on the violation that the board found. Now, what you're saying about Workday, is it undisputed because there was no policy at Tesla regarding Workday? Is that the problem? The universal testimony of everyone who was asked at the hearing, and I believe the admission of Gesowich himself, was that there was no policy. And that by itself means that getting concerned about all of a sudden seeing evidence of this, I'm just wondering if that's automatically, if the fact there's no policy, if that would automatically be disqualifying to the investigation. You see what looks like perhaps abuse of what is available. If it clarifies, Your Honor, there was also no evidence of abuse. I mean, what we have here is a posting, which was on a private Facebook page restricted to Tesla hourly employees, which Gesowich would have found out if he had bothered to ask. And the sharing that went on was between two employees who had access to Workday. So the idea that there was some sort of violation of any legitimate employer expectation, written or unwritten, when one person who had access shared with another person who had access, it simply doesn't withstand scrutiny. And the company's failure to challenge the board's findings that the rule it ultimately did implement was a violation of the act, I think, again, is dispositive here. Thank you, counsel. Thank you, Your Honors. Your Honors, I believe I have a few minutes for rebuttal. I'd make just a few points about the tweets and then Mr. Ortiz. With regard to the speech issue, I think it's, it bears emphasis just how different this case is from the cases that the board and the union relies on cases like Gissell, TRW, United Greenfield and UNF West. In each of those cases, the threats of plant closures or job losses, or denials of promotional promotions were all entirely and unquestionably events that were solely controlled by the employer and and opposed by the unions. What we have here is a statement about what the union will or will not deliver for its employees. At a minimum, that initial tweet is ambiguous. We don't think it is. We think it's clear that everything in that sentence is a reference to what the union will or will not do. But note that the ALJ and the board did not find the statement was ambiguous and potential for that construction. It said that that's the only possible reading of it. And I don't think that is defensible at all. And I think that in and of itself is an error. But if you look at this as an example, look at UNF West. There, the spokesperson for the company stated that the company could unilaterally lower wages. That was a quote from the case. He said, if the union wins, the company could reduce your wages. Who pays your salary? The question about who's going to take the action here, that that differentiates this case from all of those cases, plus the fact that this is not speech that comes up in some heated exchange between management and workers with regard to a union fight. This is statements out to the public over Twitter, makes this a very different context. And again, on its face, there's no there's no threat at all. What the board is arguing for here is it wants to punish any, quote, bear statement that unionization will cause lost benefits, close quote. That's their standard on page thirty nine of their brief, no matter how accurately that statement predicts union bargaining behavior. And that's just another attempt to impose a neutrality standard that this court and others have always rejected. With regard to Ortiz, there is a specific finding. I disagree completely with the board's characterization of it. The ALJ found that the credited evidence shows that respondent terminated Ortiz for lying during an investigation, not for any organizing activity. The there's there's no abandonment of the idea that it was the company to inquire about the use of their internal processes and resources for private purposes. And and the idea that because the board rejected the idea that you could adopt a policy or there wasn't a formal written policy, the board, by the way, criticizes the conduct here because there was also no written policy against lying during an investigation. Surely that doesn't stop the company from taking appropriate action when they see either lying during an investigation or the misuse of their internal resources. And also, I just would like to make clear that it's undisputed on this record. The ALJ notes this itself, that this was the first time that you've had a situation where employees had attempted to use the workday images for for their own personal postings, especially to attack another worker. And so the board's position is that if if an issue like that arises for the first time and it happens to come up in the context of some relation to concerted activity, the the company has no legitimate business interest to ask how were our resources used to attack another employee. And that can't be that can't be the time. Thank you, your honors. Thank you. Your honors, I have three minutes on rebuttal. I'll just say very quickly that the case law on what an objective prediction looks like in this context is very clear. There is a limit, and we have it in our briefings, in that in Ed Chandler Ford, an NLRB case, the employer indicated cited to evidence that the union had stated that they weren't in favor of employee stock options, right. So that's the kind of objective clarification that Musk maybe could have, it could have offered, right. Or I'll point to American Girl Place, another NLRB case, where the employer pointed to factual support that the union was not in favor of a stock option program. So there was an objective way if they want to, if Musk and the company wanted to make this argument. And I'll point to the fact that Musk was not summarizing some longer explanation that the company put out. This was not, you know, in these other cases, there's a more detailed explanation of what the company's saying about the union will do. Here, it was a very straightforward threat that you will lose stock options if you unionize, and it's the company that issues and takes away those stock options. So it was very clear to employees. I will also point out that even though it's Twitter used here, but it's no different than a press release. To me, these are putting statements out online, very similar to a company press release. And that's how Musk uses Twitter. He's announced new product lines, new plants, just like a press release. And so- What is your position on what Mr. Joe said, I think, unless I'm losing track of where this came up, that his attempt to clarify, maybe failed, maybe didn't. But the mere fact that it was done a couple days later is disconnected from these initial tweets. What's your take on that just being ineffective because of what seems to me to be a fairly brief delay, but maybe in the Twitter world and the way it's posted, it's just too separated. Do you have any reaction to what Mr. Joe said? It's exactly true that in Twitter, if somebody wants to post a series of messages within the same 10 minutes or the same hour, they will appear on the platform all connected. So you won't just see one message, you'll see the whole string. But the way Mr. Musk responded, multiple days later, and not to his own message, he replied- Well, two days later, right? Two days later, my apologies. Multiple sounds a little excessive, but we're going to- He responded to an unknown user, right? And so that complicates what people will see. They have to look at all the intervening tweets, or it goes back and you find it next to that it would appear, but it's just not directly linked to the earlier tweet. There's two other tweets. And the simplest way to condense it, there'd be two other unknown users tweets between the original tweet and his response. And that's also not how people look at Twitter. It just appears on your feed. And so two days later, there's kind of this, he switches what he's saying, but he doesn't repudiate as Mr. Jost explains. Well, but you're still responding, you're still clarifying. It does seem to me that maybe both of you are being a little bit too insistent on this. Well, I just want to say- If you're following that particular line of tweets, you will see the new one. I want to go back to the point that him stating no UAW does that is not a clarification. That's good. So I want to also turn to the, well, for a final point there, Your Honor, there's the context. There are multiple other unfair labor practices going on at the plant at the same time he issues this threat. And so that influences how the employees read the statement, because they already know that the employer is willing to violate the law to stop the union. So I think that's important to note. And then finally, I want to, Mr. Jost already covered this, but the board found that the employer did not have a policy regarding access to workday, that they unlawfully disciplined Jose Moran for accessing workday, and the employer did not contest that in their opening brief. Thank you, sir. Thank you, Your Honor. Let's see, I think that's the case. We don't have a rebuttal. Mr. Jost. Okay, this case will be submitted. Thank you, Your Honor. This court will adjourn until 9 o'clock Thursday morning, is that? I think that's right. Correct, Mr. Jost? Okay.